UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HARVEY A. LAPIN, Individually, and On Behalf of
All Others Similarly Situated,

                              Plaintiff,

            -v-

GOLDMAN SACHS GROUP, INC., GOLDMAN
SACHS & CO., and HENRY M. PAULSON,

                              Defendants.

Case No. 04-CV-2236 (KMK)

OPINION & ORDER

Appearances:

Ira M. Press, Esq.
Kirby McInerney & Squire, LLP
New York, New York
*Counsel for Plaintiff*

Lionel Z. Glancy, Esq.
Neal A. Dublinsky, Esq.
Mark I. Labaton, Esq.
Robin Howald, Esq.
Glancy Binkow & Goldberg LLP
Los Angeles, California
*Counsel for Plaintiff*

David H. Braff, Esq.
Stephanie G. Wheeler, Esq.
Anastasia A. Angelova, Esq.
David E. Swarts, Esq.
Sullivan & Cromwell LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      This case stems from a financial securities firm's alleged conflicts of interest. The conflict alleged pitted the firm's securities analysts against the firm's actual or potential investment banking clients. It is alleged that this conflict of interest, which was not disclosed by the firm to its shareholders, artificially inflated the price of the firm's stock purchased during the relevant time period.

      Lead Plaintiff, Harvey Lapin, filed this putative class action on behalf of himself and other similarly situated individuals who purchased shares of the defendant securities firm, Goldman Sachs Group, Inc. ("GS Group"), from July 1, 1999 to May 7, 2002 (the "Class Period"), a period in which the firm allegedly "employ[ed these] undisclosed improper business practices." (Second Am. Compl. ¶ 1 ("SAC") Plaintiff brings this action pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Specifically, Plaintiff alleges that the GS Group, and its subsidiary, Goldman, Sachs & Co. (collectively "Goldman"), along with GS Group's then-Chairman and Chief Executive Officer, Henry M. Paulson ("Paulson"), violated section 10(b) and Rule 10b-5 when they misrepresented Goldman's research analysts as "independent" and unbiased, and failed to disclose analysts' conflicts of interest with Goldman's investment banking clients, thereby artificially inflating the stock price of GS Group.

      Defendants GS Group, Goldman and Paulson (collectively "Defendants") move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, Defendants' Motion to Dismiss the Complaint is granted in part and denied in part.

<u>I.  Facts</u>

A.  Plaintiff's Allegations

Except as otherwise noted, the following facts alleged in the Second Amended Complaint are presumed true for purposes of this motion.[1]  Plaintiff purchased shares of GS Group common stock during the Class Period, *see* (SAC ¶ 16), and alleges that, unbeknownst to him and other individuals who purchased GS Group stock during the Class Period, Defendants "engaged in a series of undisclosed acts and practices that created conflicts of interest for [their] research analysts with respect to investment banking considerations."  (SAC ¶ 26)  These practices were allegedly used to help Goldman compete for Initial Public Offering ("IPO") business, which "resulted in lucrative banking fees and the promise of future investment banking and related businesses such as fees from secondary offerings, making bridge loans and other corporate financing transactions, and advising on mergers and acquisitions."  (SAC ¶ 25)  To accomplish that goal, Goldman, "among other things, compensated its research analysts in large part based on the degree to which they helped generate investment banking business for Goldman Sachs, offered its research coverage as a marketing tool to gain investment banking business, and failed to establish adequate procedures to protect research analysts from conflicts of interest."  (SAC ¶

---

[1] For purposes of this motion, Plaintiff's allegations have been accepted as true and all reasonable inferences have been drawn in Plaintiff's favor.  However, pursuant to Fed. R. Evid. 201, the Court also takes judicial notice of certain publications and publicly filed pleadings not cited in the Complaint.  *See Garb v. Republic of Poland*, 440 F.3d 579, 594 n.18 (2d Cir. 2006) (citations omitted); *see also In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 383 n.3 (S.D.N.Y. 2003) (citations omitted) [hereinafter *Merrill Lynch I*] (taking judicial notice, on a motion to dismiss, of newspaper articles for the fact of their publication).  Similarly, the Court also takes judicial notice of documents filed in another court, "'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

26)

During the Class Period, Defendants allegedly made false and misleading statements to hide these practices and their potentially fraudulent nature.  (*See generally* SAC ¶¶ 119-34)  These statements can be grouped into four categories.  The first category consists of statements, including ratings of publicly traded stocks, that describe Goldman's stock research as high quality, unbiased research, which relies on objective criteria (e.g., "[u]nder [new] leadership, we will maximize our standing in the U.S. investment community and strengthen our reputation for providing insightful, unbiased research," SAC ¶ 130).  (*See* SAC ¶¶ 119-20, 128, 130-31)  The second category consists of statements trumpeting Goldman analysts who have received high rankings in industry polls, and awards that Goldman analysts had received (e.g., "[o]ur Research Department is the only one to rank in the top three in each of the last 15 calendar years in *Institutional Investor's* 'All-America Research Team' survey," SAC ¶ 125).  (*See* SAC ¶¶ 125, 127).  The third category consists of statements noting Goldman's high ethical standards and its compliance with industry rules and regulations (e.g., "[w]e are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us," SAC ¶ 124).  (*See* SAC ¶ 124)  The fourth and final category involves omissions, rather than affirmative statements, in which Goldman "failed to give an indication of the great extent to which individual conflicts of interest were biasing analyst opinions" in equity research reports.  (SAC ¶ 122)

Plaintiff alleges that all of these statements violated securities law, because "they failed to disclose that during the Class Period defendants were engaged in a series of undisclosed and improper business practices pursuant to which Goldman Sachs failed to issue quality, objective, unbiased research reports concerning the common stocks of the companies for which Goldman

Sachs provided or sought to provide investment banking services."  (SAC ¶¶ 121, 123, 126, 129, 133)  These practices allegedly included:

> compensating research analysts primarily based on the degree to which they helped generate investment baking business, offering companies research coverage by its analysts as a marketing tool to gain investment banking business, initiating or terminating research coverage and rating stocks based on investment banking business rather than an opinion of the company's prospects and business following expert research and analysis, and a general failure to establish adequate procedures to protect research analysts from conflicts of interests.

(SAC ¶¶ 121, 123, 126, 129, 133)  Plaintiff also alleges that these statements were false in light of Goldman's failure to abide by then-applicable NYSE and NASD regulations, (*see* SAC ¶ 91-103) and its failure to adequately supervise its analysts, (*see* SAC ¶¶ 89-90) including the implementation and oversight over a so-called "Chinese Wall" that was "required to prevent the conflicts of interest that could obviously result when a firm analyzes and recommends the very securities it has itself issued or underwritten."  *Shah v. Meeker*, 435 F.3d 244, 247 (2d Cir. 2006)

The Second Amended Complaint alleges that Goldman's statements lauding its analysts and their reports as unbiased and objective ran counter to its internal pronouncements.  For example, in "pitchbooks" used to recruit potential new investment banking clients, Goldman marketed its research coverage to suggest that Goldman's supposed objective coverage would be rose-tinted once Goldman concluded the banking transaction.  (SAC ¶ 45)  In other pitchbooks, Goldman portrayed the role of its investment research analysts to include "creating" and "marketing" a covered company's "story."  (SAC ¶ 49)  The marketing of Goldman's influential research reports as a tool to attract new banking clients was further encouraged, the Second Amended Complaint alleges, by means of Goldman's compensation and evaluation policies.

(*See* SAC ¶¶ 30-40)  Under Goldman's "360 degree review" process, for example, investment bankers were often asked to review and offer their opinions on research analysts.  (SAC ¶ 31) These reviews acknowledged that research analysts often saw their primary role as generating more investment banking revenue for Goldman, as opposed to providing independent research of the covered companies.  (*See* SAC ¶¶ 32-40)  These policies and lack of internal controls, Plaintiff alleges, led Goldman's research coverage to become overly sanguine, and contrary to the analysts' internally-professed opinions. (*See* SAC ¶¶ 52-88)

Plaintiff alleges that in light of the research analysts' true opinions, Goldman's public statements concerning its objective and high-quality research were fraudulent because the practices, "if discovered, threatened to erode public, client and investor confidence in Goldman Sachs and to expose Goldman Sachs to substantial liability from government and regulatory authorities and private litigants."  (SAC ¶¶ 121, 123, 126, 129, 133)  Thus, the Second Amended Complaint alleges facts concerning whether Goldman was engaging in practices that allegedly violated NASD, SEC and/or NYSE rules which "unquestionably would be material to a reasonable investor in deciding [whether] to invest in [Goldman]."  (SAC ¶ 137)  Unaware of the true nature of Goldman's alleged improper business practices during the Class Period, the Second Amended Complaint alleges, purchasers of GS Group stock during the Class Period bought the stock "at prices which were artificially inflated."  (SAC ¶ 138)  Had purchasers of the stock known the truth concerning Goldman's business practices, Plaintiff alleges, they either would not have purchased the stock, or they would have bought it at a non-inflated "market efficient" price.  (*See* SAC ¶¶ 138-140)

Plaintiff maintains that GS Group's price was inflated during the Class Period as a result

of hiding GS Group's true business practices from investors.  Plaintiff asserts that his damages,

therefore, are demonstrated by the "steep slide" in GS Group's stock price once its true research

practices began to emerge.  (*See* SAC 142-153)  For example, on April 8, 2002, the New York

State Attorney General announced the results of a probe of a different investment bank followed

by an announcement on April 10, 2002, that he was expanding his investigation into such

practices to the whole industry, including Goldman.  (SAC ¶ 144)  As this news emerged, GS

Group's stock price declined from $86.06 on April 8, 2002 to $81.24 on April 11, 2002.  (SAC ¶

147)  Likewise, two weeks later, when the Justice Department and the SEC announced on April

23rd and April 25th, respectively, that they would also conduct investigations into such

allegations, Goldman's stock fell further to $77.21 on April 25, 2002.  (SAC ¶¶ 145, 148)

B.  Public Information Regarding Analysts' Conflict of Interest

Defendants' statements were not the only publicly available pieces of information to

investors before and during the Class Period.  Prior to the Class Period, numerous newspaper

articles reported, in general terms, on the conflicts of interests that confronted securities research

analysts.  *See generally Shah*, 435 F.3d at 247 (noting Wall Street Journal articles reporting, for

example, "'significant evidence of bias and possible conflict of interest'" (citation omitted));

*Merrill Lynch I*, 273 F. Supp. 2d at 380-81, 383-88 (same); *In re Merrill Lynch & Co. Research

Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250-52 (S.D.N.Y. 2003) (same) [hereinafter *Merrill

Lynch II*].  Defendants maintain that such articles went beyond industry generalities and were

specific to Goldman.  Goldman was specifically mentioned, and general conflicts issues were

raised, in four sources cited by Defendants.  In a June 19, 2000, exchange between CNBC

television program host, Ron Insana, and a *Wall Street Journal* reporter, the reporter discussed a

"controversy" surrounding picks made by Anthony Noto, a Goldman analyst, of internet companies most likely to survive.  The *Wall Street Journal* reporter noted that the list raised eyebrows because, among other things, "[e]verybody knows that research is connected to investment banking and fees, and clients get a break."  CNBC News Tr., *Seven of Eight Companies Recommended by Goldman Sachs Analyst are Goldman Clients; Conflict of Interest Issue Arises*, June 19, 2000.  A day later, on June 20, 2000, an article in the *Wall Street Journal* noted similar concerns about Noto's list.  Susan Pulliam, *Goldman's E-Commerce List Reduces Nonclients to Low Tiers*, Wall St. J., June 20, 2000, at C1.  However, in the same article, Noto was quoted as defending the independence and quality of his picks asserting that they "had nothing to with Goldman's banking ties," that his "research is independent from [Goldman's] corporate structure," and "Goldman's relationships are not what drove [his] thought process."  *Id.* A little over a month later, on August 1, 2000, an article in *The Philadelphia Inquirer* concluded that there was an "ethical deterioration" at big brokerage firms and noted that Arthur Levitt, then chairman of the SEC, "accused analysts of sacrificing quality research to win investment-banking business for their firms."  Miriam Hill, *Even Research Comes with Spin*, The Philadelphia Inquirer, Aug. 1, 2000, at C01.  Although Goldman was among the firms listed in the article, no specific Goldman analyst or Goldman-specific practice was mentioned.  *Id.*  Finally, on February 12, 2001, *The American Prospect* reported that among large brokerage houses, including Goldman, "analysts are little more than cheer-leaders for the firms they cover."  Ken Silverstein, *Stocking Up; Why Analysts Inflate Stock Worth*, The Am. Prospect, Feb. 12, 2001, at 17.  Yet, the article also quoted an investment banker who recognized that while people on Wall Street understand that "[a]nalysts make their living by being friendly and supportive . . . .  The problem

is that individual investors don't."  *Id.*

On June 13, 2001, a class action complaint against Goldman was filed in New York. (Wheeler Decl. Ex. E)  The case, captioned *Stefansky v. Goldman, Sachs & Co.*, alleged a breach of fiduciary duty by Goldman to its retail brokerage account holders by "favoring the interests of its investment banking clients over the interests of its retail customers."  (Wheeler Decl. Ex. E ¶ 3)  Specifically, the *Stefansky* complaint alleged that Goldman simultaneously underwrote and managed the IPO of Allied Communications Corp. ("Allied"), earning banking fees, while having its analysts cover and recommend the stock.  (*See* Wheeler Decl. Ex. E ¶¶ 27, 41, 47)  As a result, the complaint alleged, Goldman issued glowing recommendations to its retail customers to purchase Allied stock even though throughout this period Allied had "negative cash flow," and was "struggling to stay afloat."  (Wheeler Decl. Ex. E ¶¶ 39-40)

## II.  Discussion

### A.  Standard of Review

On a motion to dismiss for failure to state a claim, the Court assumes the truth of facts asserted in the complaint and draws all reasonable inferences in the plaintiff's favor.  *See Shah*, 435 F.3d at 246; *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  "A complaint should only be dismissed where it appears beyond doubt that the plaintiff can present no set of facts entitling him to relief.  At this stage of the proceedings, then, [the Court's] charge is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005) (citation omitted).

Rule 10b-5 states, in part, that it is "unlawful for any person . . . to make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To state a claim for relief under section 10(b) and Rule 10b-5, a plaintiff must adequately allege (1) that Defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs relied, and (5) that plaintiffs' reliance was the proximate cause of his injury.  *See Dura Pharm., Inc. v. Proudo*, 544 U.S. 336, 341 (2005); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Securities Litigation,* 163 F.3d 102, 106 (2d Cir. 1998)).  The requisite state of mind, or scienter, in a securities fraud action is "'an intent to deceive, manipulate or defraud.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

Securities fraud claims brought under section 10(b) and Rule 10b-5 are also subject to the heightened pleading standards required by Federal Rule of Civil Procedure 9(b).  *See Rombach*, 355 F.3d at 170 (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Second Circuit has established that to state a claim for relief under section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach*, 355 F.3d at 170.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action.  Under the

PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

Defendants first argue that Plaintiff's claims are time-barred.  (*See* Mem. of Law of Defs. in Supp. of their Mot. to Dismiss the Am. Compl. 9-11 ("Defs.' Mem."))  Defendants' second argument is that the Second Amended Complaint identified no actionable statements or omissions because:  (1) Goldman had no duty to disclose the alleged conflicts of interests since such information was already widely available (*see* Defs.' Mem. 4-9); (2) certain statements were made outside the Class Period (*see* Defs.' Mem. 16-17); and (3) the alleged statements were non-actionable puffery, statements related to corporate mismanagement, or statements of opinion, (*see* Defs.' Mem. 11-16).  Defendants' third argument is that the Second Amended Complaint does not plead fraud with particularity because the allegations of scienter are inadequate.  (*See* Defs.' Mem. 17-21)  Fourth, Defendants argue that the new allegations in the Second Amended Complaint do not adequately plead both loss causation or transaction causation.  (*See* Mem. of Law of Defs. in Supp of their Mot. to Dismiss the Second Am. Compl. 5-9 ("Defs.' SAC Mem."))  Finally, Defendants' fifth argument is that the Second Amended Complaint fails to state a claim against the individual defendant, Paulson.  (*See* Defs.' Mem. 21-23)  The Court addresses these arguments in seriatim.

B.  Statute of Limitations

Claims of securities fraud brought under section 10(b) must be "brought within one year after the discovery of the facts constituting the violation."  15 U.S.C. § 78i(e).  Section 804(a) of the Sarbanes-Oxley Act of 2002 extended this limitations period to two years, 28 U.S.C. § 1658(b), "but applies only to fraud claims arising on or after the effective date of the Act – July 30, 2002 – and does not revive claims that were already time-barred under the prior one-year limitations period."  *Shah*, 435 F.3d at 249 (citing *In re Enterprise Mortgage Acceptance Co.*, 391 F.3d 401, 411 (2d Cir. 2004)).  This limitations period "begins to run when the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'"  *Id.* (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)); *accord In re eSpeed, Inc. Sec. Litig.*, No. 05 Civ. 2091, 2006 WL 880045, at *7 (S.D.N.Y. Apr. 3, 2006) ("For statute of limitations purposes, discovery of the relevant facts includes inquiry notice as well as actual notice."  (citing *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000))).

Inquiry notice can be triggered by information contained in articles in the financial press or in other lawsuits alleging fraud by the same defendants.  *See Shah*, 435 F.3d at 249 (collecting cases regarding financial press).  For example, inquiry notice can be satisfied by "financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there may have been either misleading statements or material omissions . . . ."  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (citations omitted).  If an investor does not

undertake such inquiry, knowledge of the alleged fraud "will be imputed as of the date the duty arose." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003). Since Plaintiff has not alleged that he undertook any inquiry before filing the Complaint in this case, knowledge of the alleged fraud is imputed to Plaintiff, and the limitations period began to run, as of the date the duty to investigate arose.  *See Shah*, 435 F.3d at 249 (holding knowledge of alleged fraud is imputed to plaintiff as of the date when duty to investigate arose where plaintiff did not allege he undertook any inquiry).

A duty of inquiry arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir. 1993) (citation omitted).  Such circumstances need not lead a plaintiff to "'be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them.'"  *In re eSpeed*, 2006 WL 880045, at *7 (quoting *Salinger v. Projectvision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997)); *see also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (finding inquiry notice is triggered when a plaintiff "'had constructive notice of facts sufficient to create a duty to inquire further into that matter.  An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'" (quoting *Dodds*, 12 F.3d at 351-52)).  However, for this duty to arise, "[t]he fraud must be probable, not merely possible." *Newman*, 335 F.3d at 193 (citations omitted).  "Moreover, on a motion to dismiss, 'unless Defendants can produce uncontroverted evidence that irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law.'"  *In re eSpeed*, 2006 WL 880045, at *7 (quoting *Teamsters Local 445*

*Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919, at *4

(S.D.N.Y. Sept. 6, 2005)) (alterations omitted); *accord Lentell*, 396 F.3d at 169 (noting "fact-

specific nature of the limitations defense, particularly where the claim is foreclosed by inquiry

notice," and recognizing that the Second Circuit has been "decidedly reluctant to foreclose such

claims as untimely absent a manifest indication that plaintiffs 'could have learned' the facts

underpinning their allegations" before the end of the limitations period).

A plaintiff may not be considered to have been placed on inquiry notice, "'despite the

presence of some ominous indicators,'" when "'the warning signs are accompanied by reliable

words of comfort from management.'" *In re Alston SA*, 406 F. Supp. 2d at 421 (quoting *LC*

*Capital Partners LP*, 318 F.3d at 155). "However, reassuring statements will prevent the

emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence

would reasonably rely on the statements to allay the investor's concern." *LC Capital Partners*

*LP*, 318 F.3d at 155 (citation omitted). "Whether reassuring statements justify reasonable

reliance that apparent storm warnings have dissipated will depend in large part on [1] how

significant the company's disclosed problems are, [2] how likely they are of a recurring nature,

and [3] how substantial are the 'reassuring' steps announced to avoid their recurrence." *Id.*

Defendants argue that Plaintiff's claims are time barred because Plaintiff was placed on

inquiry notice by the aforementioned press accounts and the *Stefansky* complaint describing the

alleged conflicts of interest in the banking industry and how such conflicts potentially colored

analyst reports. The four news articles cited by Defendants were released between June 19, 2000

and February 12, 2001. If inquiry notice was triggered by these news articles, the Court must

apply the one-year statute of limitations for securities fraud claims arising before July 30, 2002.

14

Thus, if inquiry notice was triggered by these news articles, Plaintiff's claims ran no later than February 12, 2002, well before the Complaint was filed on July 18, 2003.  Likewise, if inquiry notice was triggered by the filing of the *Stefansky* complaint in New York Supreme Court on June 13, 2001, Plaintiff's claims ran no later than June 13, 2002, also well before the Complaint in this case was filed.

The news articles and the *Stefansy* complaint Defendants rely upon to argue Plaintiff was on inquiry notice are insufficient for two reasons.  First, it cannot be said as a matter of law the articles were, by themselves, sufficient to alert a reasonable person to the probability that there may have been either misleading statements or material omissions along the lines alleged by Plaintiff.  The news articles generally stated that analyst reports were influenced by investment banking considerations.  Such media reports did not go beyond the type of general warnings about analysts that have been found insufficiently detailed to alert a reasonable investor to the fraud alleged.  Reports indicating tension created by analysts' placement within firms that receive a large proportion of revenue from investment banking business do not suggest widespread fraud to create a duty of inquiry:  "[a]t most, those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud."  *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 300 (S.D.N.Y. 2004).

In *Shah*, the Second Circuit affirmed the lower court's grant of a motion to dismiss involving almost identical claims based on a finding of inquiry notice because the media reports went beyond "the mere existence of a conflict of interest" and "specifically describ[ed] the business practices at [the Defendant bank]."  435 F.3d at 250-51.  The *Shah* court stressed that the media reports "described in great detail how [a specific analyst's] divided loyalties in fact

15

affected her analytical reports," and "included a specific example of how [the analyst] used her research coverage as a 'carrot' to gain investment banking business." *Id.* There are no such detailed reports here.

Similarly, the *Stefansky* complaint merely alleges general grounds for potential conflicts of interest at Goldman due to the closer relationship between investment bankers and analysts. The most detailed allegation in that complaint that could even possibly trigger inquiry notice is that "analysts rarely issue a 'sell' recommendation because such a recommendation will drive down the price of a stock and compromise a firm's relationship with the issuer." (Wheeler Decl. Ex. E ¶ 22) Such general allegations do not rise to the level discussed in *Shah* for a plaintiff to perceive the general fraudulent scheme alleged.

Second, even assuming that the press articles and the *Stefansky* complaint constituted storm warnings, investors were also being fed reassuring statements by Goldman, implying that the criticisms discussed in the articles and the complaint did not apply to Goldman. Indeed, the news article cited by Defendants that most pointedly raised the issue of potential conflicts at Goldman highlights this very point. The June 20, 2000, *Wall Street Journal* article discussed the conflict of interests in the industry and how such conflicts may have influenced a particular Goldman analysts's stock recommendations. Yet, in that article, the Goldman analyst defended the independence and quality of his research without qualification. *See* Pulliam, *supra*, at C1. This message was reinforced by Goldman in several announcements made both contemporaneously with and post-dating the news articles and the filing of the *Stefansky* complaint. These announcements reiterated the independence and objectivity of Goldman's equity research, also without qualification. (*See, e.g.*, SAC ¶¶ 130-31 ("We are pleased to

16

announce this strong new leadership team and to reaffirm the importance of distinguished and truly independent investment research to Goldman Sachs.")  Such statements could persuade a reasonable investor into thinking that Goldman was different from its peer banks, and that it took a more serious approach to monitoring and protecting against these type of analyst conflicts. Moreover, despite the news reports and *Stefansky* complaint that were supposedly absorbed into Goldman's market price, Goldman stock still suffered a sizable drop in value when the state and federal investigations into investment bank practices were announced to the investing public, thereby suggesting that the news reports and *Stefansky* complaint did not put Plaintiff on inquiry notice.  *See Newman*, 335 F.3d at 195 (relative stability of stock price at the time news allegedly put plaintiff on inquiry notice supports a finding that inquiry notice was not triggered); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("[D]efendants' claim that the market knew or should have known of [the company's problems] is belied by the precipitous drop in . . . securities prices that followed immediately after . . . information of [the company's] actual financial condition started to emerge.").  Accordingly, a reasonable investor's understanding of the extent of the alleged conflicts at Goldman during the Class Period did not, as a matter of law, give rise to a duty of inquiry.

C.  Materiality

Defendants next argue that any misstatements or omissions made by Defendants were immaterial as a matter of law, for three reasons.  First, Defendants argue that certain statements in the Second Amended Complaint are not actionable because they were made outside of the Class Period.  Second, Defendants advance a "truth-on-the-market" defense:  "Goldman Sachs had no duty to disclose the alleged conflicts of interest, because alleged analyst conflicts of

interest was a subject widely observed within the public domain for years." (Defs.' Mem. 4)

Third, Defendants contend that numerous statements alleged in the Second Amended Complaint

regarding Goldman's integrity were non-actionable puffery, assertions of corporate

mismanagement, or statements of opinion.

      1.  Statements Made Outside of the Class Period

Defendants argue that the statements alleged in paragraphs 122 (February 5, 1998

research report), 125 (May 1999 prospectus), and 132 (June 5, 2003 Paulson speech) fall outside

the Class Period and are therefore not actionable.[2]  (Defs.' Mem. 16)  Defendants are correct in

noting that they are "liable only for those statements made during the class period."  *In re IBM*

*Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citations omitted).  However, even under this

standard, a complaint's inclusion of statements made before the class period does not require

dismissal when they are "relevant in determining whether defendants had a duty to make a

corrective disclosure during the Class Period."  *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp.

2d 283, 290-91 (S.D.N.Y. 1999).  As to post-class period statements, "[t]he Second Circuit has

explicitly recognized that plaintiffs may 'rel[y] on post-class period [statements] to confirm what

a defendant should have known during the class period.'"  *In re Vivendi*, 381 F. Supp. 2d at 181

(quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).

The Second Amended Complaint alleges that the February 5, 1998 research report is

typical of the materially false and misleading disclaimers published by Goldman during the Class

Period because they omitted to state facts necessary to make them not materially misleading.

---

[2] For the sake of clarity, Defendants' citations to the paragraphs of the First Amended Complaint have been updated to reflect the numbering of the identical paragraphs in the Second Amended Complaint.

(*See* SAC ¶¶ 122-23)  Thus, this allegation is sufficiently relevant to the determination of whether Defendants had a duty to update and therefore survives dismissal.  Similarly, the allegations contained in the May 1999 prospectus (SAC ¶ 125) are also relevant in determining whether Defendants had a duty to update such representations.  The June 5, 2003 statements acknowledging that Goldman did not do "as good a job as [it] might have in preserving and protecting the appearance of independence of [its] research analysts" also survive the Motion to Dismiss for the limited purpose of showing what Defendants should have known during the Class Period.

> ### 2.  Truth-on-the-Market

Defendants maintain the conflicts of interests alleged in the Second Amended Complaint were widely reported in the news media as early as 1995.  (Defs.' Mem. 5)  In light of such widespread reporting, they argue, the alleged research conflicts could not have been viewed by a reasonable investor to be material.  (Defs.' Mem. 8-9)

An omission is actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993).  Such a duty "arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."  *Id.* at 268.  Of course, the lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one "has a duty to be both accurate and complete."  *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002).

"To fulfill the materiality requirement 'there must be a substantial likelihood that the

19

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 329 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").  "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161.  Therefore, "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin*, 295 F.3d at 359.

"[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167 (citations omitted).  Thus, "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Id.* (citations omitted).  However, as in the discussion regarding inquiry notice, the Second Circuit has stressed that such "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged statements." *Id.* (citation and internal quotations omitted).  Such a "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint to plead materiality." *Id.* (citation omitted); *see also In re*

20

*Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1994) ("[D]efendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage.").  The facts as alleged here do not present an exception to this rule.

In addition to the same collection of news articles and the *Stefansky* complaint addressed earlier in the inquiry notice discussion, Defendants also point to a disclaimer in a Goldman research report to show that any alleged conflicts were fully disclosed.  The disclaimer merely stated that Goldman acted as a dealer of the covered company in the past several years and rendered significant corporate finance services to the covered company.  (Defs.' Mem. 8)  These disclaimers are a far cry from raising awareness of anything akin to the widespread fraud and improper influence alleged in connection with Goldman's analyst reports.

Another court in this district has held that allegedly misleading "bullish" analysis and high ratings were not rendered immaterial by skeptical language contained in the same reports, because "the very fact that, notwithstanding the skeptical language, the reports gave [the covered company] the highest possible 'buy' rating is tantamount to a statement that the reader of the reports should discount the skeptical language."  *DeMarco v. Lehman Bros. Inc.*, 309 F. Supp. 2d 631, 634 (S.D.N.Y. 2004).  As already noted, even if the news articles, the *Stefansky* complaint, and the disclaimers in Goldman research reports raised some concern in the market about Goldman's alleged conflicts, such information was counteracted by contemporaneous statements by Goldman, informing the market that its research was of high quality, independent, and objective.  Thus, the Court concludes there are sufficient facts pled to question whether the alleged "truth-on-the-market" was said with the degree of intensity and credibility sufficient to

counter-balance any allegedly misleading statements made by Defendants.  *See Ganino*, 228 F.3d

162, 167 (recognizing that "'a complaint may not properly be dismissed . . . on the ground that

the alleged misstatements or omissions are not material unless they are so obviously unimportant

to a reasonable investor that reasonable minds could not differ on the question of their

importance.'" (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985))).

### 3.  Puffery, Corporate Mismanagement, and Statements of Opinion

Goldman contends that statements concerning its integrity alleged in the Second

Amended Complaint are not actionable because they amount to vague statements of corporate

mismanagement, (Defs.' Mem. 12-13) puffery, (Defs.' Mem. 14-15), and statements of opinion,

(Defs.' Mem. 15-16).  These statements include a press release accompanying an announcement

of a new leadership team:  "[u]nder their leadership we will maximize our standing in the U.S.

investment community and strengthen our reputation for providing insightful, unbiased

research."  (SAC ¶ 130)  Another contested statement announcing new co-directors of

Goldman's Global Investment Research noted these appointments "reaffirm the importance of

distinguished and truly independent investment research to Goldman Sachs."  (SAC ¶ 131)

Goldman also challenges the inclusion of its business principles which contain value statements

such as: "integrity and honesty are at the heart of our business."[3]  (SAC ¶ 124)

It is well accepted that "expressions of puffery and corporate optimism do not give rise to

securities violations."  *Rombach*, 355 F.3d at 174 (citation omitted)  The Second Circuit

---

[3] Curiously, in Defendants' selection of what to include from this relatively short list of
business principles, (*see* Defs.' Mem. 14) they chose not to include the short paragraph
concerning compliance with the law:  "[w]e are dedicated to complying fully with the letter and
spirit of the laws, rules and ethical principles that govern us.  Our continued success depends
upon unswerving adherence to this standard."  (SAC ¶ 124)

recognizes that "[u]p to a point, companies must be permitted to operate with a hopeful outlook," and that as a result, executives "are not required to take a gloomy, fearful or defeatist view of the future." *Id.* (quotations and citations omitted); *accord In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004) ("The PSLRA deems generalized expressions of corporate optimism immaterial as a matter of law and therefore insufficient as the basis for an action alleging securities fraud."); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (holding that an actionable statement "must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." (quotations and citations omitted)). Likewise, allegations of corporate mismanagement without an element of deception or manipulation are not actionable. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375-76 (S.D.N.Y. 2004). The important limitation on these principles is that optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the opinions imply certainty. *See In re IBM Sec. Litig.*, 163 F.3d at 107 ("Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, . . . or if the speaker does not genuinely or reasonably believe them" at the time they were made.) (citations omitted); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory situation was "'in good shape'" or "'under control'" while defendants "allegedly knew the contrary was true," are actionable statements of securities fraud as more than mere statements of opinion or puffery); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D 133, 141 (S.D.N.Y. 1999) (beliefs based on factual assertions made by the defendants

when "[t]here is also evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs" may be actionable under § 10(b)).

Under these standards, the statements Defendants challenge are actionable.  Defendants argue that the alleged statements cannot support a securities fraud claim because no reasonable investor would have relied upon them.  Yet, it defies logic to suggest that, for example, an investor would not reasonably rely on a statement, contained in what Defendants concede was a list of Goldman's business principles, that recognized Goldman's dedication to complying with the letter and spirit of the laws and that Goldman's success depended on such adherence. "[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'"  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (quoting *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001)).  Moreover, the Second Amended Complaint does more than identify rosy predictions or vague statements about Goldman's integrity; Goldman stated that such integrity "was at the heart" of its business and attempted to distinguish itself from other institutions based on its "truly independent investment research" while it allegedly knew the contrary was true. Goldman also misconstrues Plaintiff's allegations as merely stating it mismanaged its research business by allowing conflicts to proliferate.  (Defs.' Mem. 12)  The Second Amended Complaint actually alleges that Goldman knew about the pervasive conflicts and the effect they had on its research reports and buy recommendations, allegedly one of its core competencies, yet,

24

they allegedly failed to disclose such material information to its investors.[4]

Assuming these allegations to be true, there is enough to suggest that Defendants were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs, namely that contrary to their truly-held beliefs, Goldman analysts changed or withheld negative reports to appease Goldman's investment bankers and clients (*see* SAC ¶¶ 52-88).  *See Ganino*, 228 F.3d at 162 ("[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case.").  In this context, Defendants' "vague statements" were actually statements that implied certainty when, in fact, Defendants' purportedly had little reason to believe them.  *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("conclusory terms in a commercial context [may be] reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."); *In re Vivendi*, 381 F. Supp. 2d at 182 (continued representation to the public that the company was financially solid, "despite being aware of the financial precipice on which it stood" sufficiently alleged facts to show defendants "could not have reasonably believed the statements made to the public").  Looking to Plaintiff's allegations, the accuracy of which must be assumed at this stage, Plaintiff has plead sufficient facts to show Defendants' statements, characterized by Defendants as mere corporate mismanagement, puffery,

---

[4] *See, e.g.*, SAC ¶ 10 ("The SEC allegations . . . make expressly clear that senior management of Goldman Sachs had actual knowledge of the misconduct at issue."); ¶¶ 89-90 ("Having played a hand in the creation of the [conflicts of interest], in part through the implementation of the 'Research Realignment' initiative, Goldman Sachs management was aware of the problems its analysts were facing in producing objective research."  Yet, despite this knowledge, Goldman "failed to adequately supervise its analysts in such a way as to minimize the risks presented by conflicts of interest within the firm."); ¶ 125 ("We believe that investment research is a significant factor in our strong competitive position in debt and equity underwritings and in our generation of commission revenues.").

or opinion, are indeed actionable.

      D.  Scienter

      Having alleged that Defendants misled investors, Plaintiffs must also adequately plead scienter.  To do so, the Second Amended Complaint is required to allege facts that give rise to a strong inference of intent to "deceive, manipulate or defraud."  *Ganino*, 228 F.3d at 168 (quotations and citations omitted).  That intent can be established either by:  (1) alleging facts showing Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *See Rombach*, 355 F.3d at 176; *Ganino*, 228 F.3d at 168; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  To state a claim based on recklessness, plaintiffs can either "specifically allege[ ] defendant[s'] knowledge of facts or access to information contradicting [defendant's] public statements[,]" or allege that defendants "failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 308, 311.  Generally, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Id.* at 309 (citation omitted).  "In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint *in toto* and most favorably to plaintiff."  *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (quotations and citations omitted).

      Reading the complaint in a light most favorable to Plaintiff, it arguably alleges facts sufficient to state a claim based on recklessness.  Indeed, Plaintiff alleges in specific detail that Goldman analysts issued recommendations that were contrary to their true evaluations of their covered securities "or were otherwise tainted by conflicts of interest – strong circumstantial

evidence of conscious misbehavior."[5] *Fogarazzo*, 341 F. Supp. 2d at 295.  Here, Plaintiff also

has alleged that Goldman, through statements made by senior Goldman analysts and investment

bankers, had access to information about the conflicts and the fact that its research reports did not

accurately reflect analysts' true opinions and chose not to disclose this to the public.  Under these

circumstances, Goldman "'knew or, more importantly, should have known that they were

misrepresenting material facts related to the corporation,' and scienter is adequately plead."[6]  *In*

---

[5] *See, e.g.*, SAC ¶¶ 53-54 (email from Goldman analyst explaining it would be problematic to lower a company's numbers when Goldman has "a deal in the market" – despite this concern, the company was given Goldman's highest rating); ¶ 56 (Goldman analyst downplaying a company's funding issues in response to management's concerns); ¶¶ 58-59, 62 (Goldman analyst reports were vetted by management of covered companies and were changed to include management edits depicted in one internal email as "smooth[ing] out the negative edge"); ¶ 61 (internal email from Goldman analyst questioning Goldman's high rating of Global Crossing when its "management was not credible and the company's guidance did not make any sense"); ¶ 70 (email from Goldman Business Unit Leader for U.S. Telecommunications explaining to his European counterpart that "investment banking considerations have prevented me from making a change [to downgrade certain telecom stocks]"); ¶ 72 (email from Goldman's "head of U.S. telecom research" telling his European counterpart that he "would have loved to have cut ratings long ago.  Unfortunately, we can't cut [AT&T], because we're essentially restricted there . . . ."); ¶¶ 76-78 (emails from institutional investors thanking analyst for giving him advance warning of Goldman's forthcoming downgrade of a stock before release to the investing public – "I really appreciate your straight forward comments . . . last week.  Looks like our worst concerns were realized yesterday.  Fortunately, we were able to get out of our last piece . . . and avoid the recent carnage . . . .  Still painful, but it could have been a lot worse . . . thanks"); ¶ 80 (despite analyst's statement that he cannot produce a stock price "above the current levels," Goldman initiated coverage on the stock with a rating that the stock would outperform the market by five to ten percent); ¶ 83 (Goldman retained company's high rating despite analyst's description of the stock's price drop as a "death spiral," which reflected "the stench of reality wafting through the air"); ¶ 84 (analyst noting her discomfort in justifying a company's bloated trading price was told to pull it from Goldman's "recommended list," yet despite this discussion, the stock retained its high rating); ¶ 163 (Goldman analyst credited in an email as a determining factor in winning an IPO and that his "input [would] be critical to the success of [the] IPO").

[6] Plaintiff also asserts that Goldman had motive and opportunity to commit fraud. Because the Court has determined that Plaintiff has raised an adequate "correspondingly greater" inference of recklessness, *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotations and

*re Alstom*, 406 F. Supp. 2d at 456-57 (quoting *Novak*, 216 F.3d at 308).

The Second Amended Complaint could be read to also assert section 10(b) and Rule 10b-5 violations against Defendant Paulson.  (*See* SAC ¶¶ 173-77 (stating 10(b) claim "against all defendants"))  However, as acknowledged by Plaintiff's counsel at oral argument, this reading of the Second Amended Complaint is incorrect because Plaintiff did not allege scienter as to Paulson.  (Tr. 66, Feb. 23, 2006)  Accordingly, to the extent a primary fraud claim is alleged against Defendant Paulson, the Court dismisses such a claim.[7]

### E.  Loss Causation and Transaction Causation

#### 1.  Loss Causation

Defendants next argue that the Second Amended Complaint fails to adequately allege "loss causation" because it does not allege "any connection whatsoever between the allegedly false research reports *on other companies* and the alleged loss suffered by *Goldman Sachs* shareholders based on their investment in *Goldman Sachs' own stock.*."  (Defs.' SAC Mem. 5-7)  This argument misinterprets the allegations set forth in the Second Amended Complaint.

"Loss causation," which is the securities law equivalent of tort law's "proximate cause," "requires that plaintiff adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of [the implicated] securities."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  The Second Circuit has further explained that:

---

citations omitted), the Court does not address Plaintiff's remaining allegations of scienter.

[7] Plaintiff's "control person" claim against Defendant Paulson under section 20(a) of the Exchange Act is discussed *infra* in Part III.F.

> "[O]ur precedents make clear that loss causation has to do with the
> relationship between the plaintiff's investment loss and the
> information misstated or concealed by the defendant. If that
> relationship is sufficiently direct, loss causation is established, but
> if the connection is attenuated, or if the plaintiff fails to
> demonstrate a causal connection between the content of the alleged
> misstatements or omissions and the harm actually suffered, a fraud
> claim will not lie."

*Lentell*, 396 F.3d at 174 (citations and quotations omitted); *see also In re IPO Sec. Litig.*, 399 F.

Supp. 2d 298, 303, 307 (S.D.N.Y. 2005) (discussing "murky" loss causation pleading standard

and holding "where the alleged misstatement is an intentionally false opinion, the market will not

respond to the truth until the falsity is revealed – i.e. a corrective disclosure" (citations omitted)).

Thus, Plaintiff must plead that his losses proximately resulted from the marketplace's reaction to

the revelation of the truth that Defendants' actionable statements concealed.

The Second Amended Complaint alleges that in April 2002 the New York Attorney

General, and subsequently the Justice Department and the SEC, announced they were

investigating conflicts of interest at Wall Street firms. Following closely after these

announcements, the Second Amended Complaint alleges, the market was finally apprised of the

negative information concerning the false analyst reports and that, as a result of these revelations,

GS Group's stock declined, causing the losses on which Plaintiff here sues. (*See* SAC ¶¶ 143-

153) Defendants counter that initiation of an investigation into Goldman's conflicts was not the

true "corrective disclosure" point, but rather the real "corrective disclosure" point was when

regulators released the internal Goldman communications that "supposedly expos[ed] the falsity

of the firm's research on certain other companies" in April 2003. (Defs.' SAC Mem. 6) There is

"no requirement that corrective disclosures emanate from the company itself, so long as the truth

is disclosed in some fashion." *In re eSpeed*, 2006 WL 880045, at *18; *see also In re Winstar*

*Commc'ns*, No. 01 Civ. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (holding there

is no requirement as to who may serve as the source of information of a corrective disclosure).

"[N]or is there any requirement that the disclosure take a particular form or be of a particular

quality. . . . It is the exposure of the fraudulent representation that is the critical component of

loss causation." *Id*.   Drawing all reasonable inferences in Plaintiff's favor, the announcement by

the regulators in April 2002 could establish that, even without the underlying communications, it

was finally revealed to the market that Goldman's research reports were not objective and

independent as touted and that they were heavily manipulated by investment banking pressures.

2.  Transaction Causation

Defendants also challenge whether Plaintiff has adequately alleged "transaction

causation," which is "generally understood as reliance."  *Castellano v. Young & Rubicam, Inc.*,

257 F.3d 171, 186 (2d Cir. 2001).  Plaintiff relies on the "fraud on the market" doctrine initially

put forth in *Basic v. Levinson*, 485 U.S. 224 (1988), which established that "where there has been

a misrepresentation to the securities marketplace, a rebuttable presumption arises that investors

who purchased or sold securities in an efficient market relied upon the misrepresentation."

*DeMarco*, 309 F. Supp. 2d at 635 (citing *Basic*, 485 U.S. at 248-49).

Citing to *DeMarco v. Lehman Bros., Inc.*, 222 F.R.D. 243 (S.D.N.Y. 2004), Defendants

counter that the *Basic* presumption is inapplicable to research reports.  *DeMarco* explained there

is a "qualitative difference between a statement of fact emanating from an issuer and a statement

of opinion emanating from a research analyst.  A well-developed efficient market can reasonably

be presumed to translate the former into an effect on price, whereas no such presumption attaches

to the latter."  224 F.R.D. at 246.  This distinction was based on the reasoning that "a statement

of opinion emanating from a research analyst is far more subjective and far less certain, and often appears in tandem with conflicting opinions from other analysts as well as new statements from the issuer." *Id.* at 247.  In effect, *DeMarco* suggests that an analyst report analyzing *another* company's stock is just one source of information, among many, impacting a company's stock price and therefore its effect on the market price must be teased out of the other pieces of information to make a reliance showing.  This concern holds no sway here because Plaintiff's reliance is not founded on an argument that the market price of other companies was impacted by Goldman's misrepresentations.  Rather, just like the issuers in *DeMarco*, whose statements "[a] well-developed efficient market can reasonably be presumed to translate . . . into an effect on price," *id.* at 246, the statements alleged in the Second Amended Complaint were statements by Goldman about Goldman and thus the *Basic* presumption applies.

### F.  Control Person Liability

In addition to the claims against Goldman, Plaintiff has asserted Defendant Paulson was liable for Goldman's alleged section 10(b) and Rule 10b-5 violations as a controlling person under section 20(a) of the 1934 Act.  Section 20(a) provides:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "In order to establish a *prima facie* case of liability under § 20(a) [in the Second Circuit], a plaintiff must show:  (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some

meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

The control person claims under section 20(a) asserted against Defendant Paulson are premised on a primary violation of section 10(b) by Goldman.  Because those primary liability claims have been found by the Court sufficient to survive Defendants' Motion to Dismiss, the section 20(a) claims have the requisite primary violation foundation.  Defendants do not challenge that Plaintiff has pled facts sufficient to satisfy the second element of a prima facie claim, that Defendant Paulson, as Chairman and CEO of GS Group, possessed control over the primary violators.  *See First Jersey*, 101 F.3d at 1472-73 ("Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" (quoting 17 C.F.R. § 240.12b-2)).  Thus, the sufficiency of this claim turns on the question of Defendant Paulson's "culpable participation."

In *First Jersey*, the Circuit held a prima facie case of liability under section 20(a) requires a plaintiff to show, *inter alia*, that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  101 F.3d at 1472 (citations and alternations omitted).  Subsequently, a number of Second Circuit cases have cited to *First Jersey* for the proposition that a plaintiff must show some level of culpable participation to establish a prima facie case of section 20(a) liability.  *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person

controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." (citing *First Jersey*, 101 F.3d at 1472)); *In re Scholastic*, 252 F.3d at 77 (citing *First Jersey*, 101 F.3d at 1472)); *Ganino*, 228 F.3d at 170 (adopting *First Jersey*'s requirement that a plaintiff must show "'that the controlling person was in some meaningful sense a culpable participant in the fraud'"); *Boguslavsky*, 159 F.3d at 720 ("In particular, we note that a determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability.").[8]

Nevertheless, district courts within the Second Circuit have divided over whether section 20(a) requires an allegation of "culpable participation" as an element of a section 20(a) violation, or whether section 20(a) created a burden-shifting framework where plaintiffs must only plead a primary section 10(b) violation and control, with defendants allowed to raise a good faith defense in their answer that can later be rebutted by plaintiffs. *Compare In re Alstom*, 406 F. Supp. 2d at 489 ("[T]he authority available [still] balances toward holding that the plaintiff bears the burden of pleading culpability as part of a prima facie case under § 20(a)."), *and In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 679 (S.D.N.Y. 1990) (requiring plaintiff to plead the alleged controlling defendants were "in some meaningful sense culpable participants in the fraud" such as where the "controlling persons encouraged and permitted the issuance of statements they knew were false") (citing *Lanza*, 479 F.2d at 1299), *with In re IPO Sec. Litig.*, 241 F. Supp. 2d at 396

---

[8] The Second Circuit first recognized the "culpable participation" component of section 20(a) liability in *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973), when it observed that the "intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* at 1299.

(finding scienter "not an essential element of a Section 20(a) claim . . . [r]ather, a plaintiff need only prove scienter if a defendant presents the affirmative defense that it acted in good faith").

It is thus no surprise that courts within the Second Circuit adopt different standards for pleading "culpable participation."  *See generally In re Vivendi*, 381 F. Supp. 2d at 189 ("Courts in this district have adopted various standards to plead culpable participation" (collecting cases)); *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, at *22 (S.D.N.Y. Sept. 23, 1998) ("Although one would think, and hope, that the standard to be applied to a motion to dismiss a section 20(a) claim is well-established, the opposite is all too unfortunately the case." (collecting cases)).  Some courts have read the Second Circuit's decisions to mean that a plaintiff "need not affirmatively plead scienter on the part of a control person" in order to survive a motion to dismiss a section 20(a) claim.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ. 9016, 2006 WL 2053326, at *13 (S.D.N.Y. July, 20, 2006) (citing *In re IPO Sec. Litig.*, 241 F. Supp. 2d at 395-96); *accord In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 439-41 (S.D.N.Y. 2006); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363-64 (S.D.N.Y. 2005); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) (holding no heightened pleading standard for section 20(a) claims; once plaintiff successfully pleads an underlying section 10(b) claim, then without more, "those who control that violator may be sued too").  Instead, at the pleading stage, these cases only require section 20(a) control liability to be alleged in accordance with Rule 8(a).  *See, e.g.*, *In re WorldCom*, 294 F. Supp. 2d at 415.

Other courts within the Second Circuirt, however, view the burden as more akin to pleading section 10(b) scienter.  *See, e.g., In re Marsh & McLennan Cos. Sec. Litig.*, No. MDL

34

No. 1744, No. 04 Civ. 8144, 2006 WL 2057194, at *36 (S.D.N.Y. July 20, 2006) (noting that the pleading required for culpable participation "has been the subject of great debate in this District," and holding that "plaintiffs must, at a minimum, plead recklessness in the same sense required by Section 10(b)" (citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 417 (S.D.N.Y. 2001))); *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing section 20(a) claim for failure to plead culpable participation "with the requisite specificity"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 n.24 (S.D.N.Y. 2004) ("Despite recent decisions within this Circuit arguing that no showing of culpable participation is necessary, the Court here adheres to its prior position that the plaintiff must allege culpable participation."); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125, 2002 WL 31191741, at *7-8 (S.D.N.Y. Sept. 30, 2002) (holding that plaintiff must plead with particularity that the controlling person "knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct" (citations and quotations omitted)); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (finding "culpable participation element is subject to the heightened pleading requirements of the PSLRA," and that a plaintiff may plead either conscious misbehavior or recklessness to satisfy the state of mind portion of the culpable participation element) (citations omitted); *Mishkin*, 1998 WL 651065, at *24-25 (S.D.N.Y. Sept. 23, 1998) (reading *First Jersey* to impose an "initial burden" on plaintiffs pleading section 20(a) claims to allege "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud").

The Court agrees with the line of cases that applies Second Circuit precedent to hold that

"culpable participation" is a pleading requirement to state a section 20(a) claim, and that it must

be plead with the same particularity as scienter under section 10(b).  Namely, in order to

withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum, particularized

facts of the controlling person's conscious misbehavior or recklessness.  *See In re Alstom*, 406 F.

Supp. 2d at 490 (noting that culpable participation requires "'something more than'" mere

negligence) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n.28 (1976)); *Steed Fin.*,

2001 WL 1111508, at *10 ("A plaintiff may plead either conscious misbehavior or recklessness

to satisfy the state of mind portion of the culpable participation element."); *In re Livent*, 151 F.

Supp. 2d at 417 (holding that "recklessness is the appropriate minimum standard of culpability

that plaintiffs must plead under § 20(a)").

The Court believes this conclusion is most consistent with the decisions of the Second

Circuit and the PSLRA.  As noted, under *First Jersey* and its progeny, a showing of prima facie

liability for section 20(a) claims requires that "the controlling person was in some meaningful

sense a culpable participant in the fraud perpetrated by the controlled person."  101 F.3d at 1472

(citation omitted); *see also Suez Equity*, 250 F.3d at 101 (noting that to plead section 20(a)

liability, plaintiff must allege "a primary § 10(b) violation by a person controlled by the

defendant *and culpable participation by the defendant in the perpetration in the fraud*"

(emphasis added)).  Thus, the term "culpable participation" suggests some "individualized

determination . . . of the defendant [controller's] particular culpability."  *Boguslavsky*, 159 F.3d

at 720.  "Since culpable participation is an element, the PSLRA's heightened pleading

requirements apply, and plaintiffs must plead with particularity facts giving rise to a strong

inference that the controlling person knew or should have known that the primary violator, over

36

whom that person had control, was engaging in fraudulent conduct." *Burstyn*, 2002 WL 31191741, at *8 (omitting citation and quotation); *accord In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 196 n.6 (1st Cir. 2005) ("'Culpable participation'" would seem to imply a culpable state of mind.  If that is an element of a claim under § 20(a), the PSLRA's strong-inference requirement would appear to apply, as well."); *In re Bayer AG Sec. Litig.*, 2004 WL 2190357, at *16 (holding that PSLRA requirement that scienter be pled with specificity applies in section 20(a) cases); *Mishkin*, 1998 WL 651065, at *24 ("[I]n order to prevail under section 20(a), a plaintiff must come forward with 'proof that a defendant acted with a particular state of mind.").

The Court is fully aware that there are objections to this approach.  First, it has been argued that Second Circuit case law does not, in fact, impose on section 20(a) plaintiffs the initial burden of proving culpable participation.  According to this view, the Second Circuit shied away from imposing such a scienter requirement in *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), and has never overturned, or retreated from, that decision.  *See Parmalat*, 375 F. Supp. 2d at 308-09; *In re IPO Sec. Litig.*, 241 F. Supp. 2d at 395.  However, *Marbury Mgmt.* merely echoed the burden shifting component of section 20(a) that requires the defense to establish good faith once a plaintiff established a prime facie case.  *Id.* at 716.  Moreover, any apparent inconsistency between *Lanza* and *Marbury Mgmt.* was reconciled in *First Jersey*.  In that case, the Second Circuit held:

> In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, *see Marbury Management, Inc. v. Kohn*, 629 F.2d at 715-16, and show that the controlling person was 'in some meaningful sense [a] culpable participant[], in the fraud perpetrated by [the] controlled person[],' *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir. 1984) (quoting *Lanza v. Drexel & Co.*, 479 F.2d 1277,

1299 (2d Cir. 1973) (en banc)) . . . .

> Once the plaintiff makes out a prima facie case of § 20(a) liability,
> the burden shifts to the defendant to show that he acted in good
> faith, *see Marbury Management, Inc. v. Kohn*, 629 F.2d at 716;
> *Gordon v. Burr*, 506 F.2d 1086, and that he 'did not directly or
> indirectly induce the act or acts constituting the violation,' 15
> U.S.C. § 78t.

*First Jersey*, 101 F.3d at 1472-73.  This passage is quoted at length to demonstrate that while the

Second Circuit has never overruled *Marbury Mgmt.*, it has not diluted *Lanza* either.  In fact,

beginning with *First Jersey*, the Second Circuit repeatedly has gone beyond *Lanza* to state that a

section 20(a) plaintiff must establish a defendant's culpable participation to state a prima facie

case.  *See Suez Equity*, 250 F.3d at 101-02; *In re Scholastic*, 252 F.3d at 77; *Ganino*, 228 F.3d at

170; *Boguslavsky*, 159 F.3d at 720.[9]

---

[9] Some courts have challenged even this proposition, claiming that in *Suez Equity*, the
Second Circuit suggested that pleading control (in addition to the primary violation) was
sufficient.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 310 n.213; *In re IPO Sec. Litig.*,
241 F. Supp. 2d at 395.  In support of this claim, these courts have quoted the following passage
from *Suez Equity*:

> The complaint alleges that Deroziere was an officer of the Bank
> and that he had primary responsibility for the dealings of that Bank
> and the other corporate defendants with SAM Grojp.  While
> somewhat broad, this allegation is sufficient to plead controlling-
> person liability for the Bank derived from DeRoziere, the
> purported primary violator.

*Suez Equity*, 250 F.3d at 101.  Yet, this quote must be understood in context.  Preceding that
quote was a recitation of defendants' argument that "plaintiffs' § 20 claims must fail because the
complaint does not allege any facts supporting a finding that the corporate defendants or Rindahl
*controlled* DeRoziere."  *Id.*  (emphasis added)  Thus, the above-quoted statement merely
reflected the court's view that the complaint adequately pleaded *control* as to certain of the
defendants.  Indeed, in the very next paragraph, the court held that the complaint failed to
sufficiently plead control as to certain of the remaining defendants.  *Id.* at 102 ("The Complaint
also alleges that Capital, Securities, and Holdings controlled various of the other corporate
defendants.  These vague allegations are conclusory at best, indicating only that certain

A second, and more persuasive argument, is that requiring section 20(a) plaintiffs to plead scienter is inconsistent with the language of the statue. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 308. The statute plainly imposes liability on a controlling person for any primary violation, unless the controlling person acted in good faith and did not induce the action. As has been noted by one court, the "interpretation most consistent with the text is that the defendant bears the burden of establishing good faith and lack of inducement, not that the plaintiff must allege the opposite in its pleadings." *Id.* However, this is not a question being considered on a clean slate, as the language of section 20(a) has remained unchanged since *Lanza* and *First Jersey*. Thus, whatever may be said among district courts about reconciling the plain language of section 20(a) and a requirement that scienter be pled, the Second Circuit has spoken and has imposed a "culpable participation" requirement to make out a prima facie case. Accordingly, the Court here agrees with, among others, *In re Marsh & McLennan*, 2006 WL 2057194, at *36, and *In re Alstom*, 406 F. Supp 2d at 490, that until the Second Circuit holds otherwise, some level of culpable participation at least approximating recklessness in the section 10(b) context must be alleged to state a section 20(a) claim.[10] Because Plaintiff conceded that he did not allege scienter

---

employees worked for multiple defendants, and are insufficient under § 20 as a matter of law. Rindahl is not alleged to control any of the other defendants and is therefore not a controlling person under this provision."). Thus, *Suez Equity* does nothing to change, and did not remotely suggest it did anything to change, the *First Jersey* requirement that "culpable participation" is a threshold requirement for a prima facie section 20(a) case.

[10] Moreover, any analysis of statutory text must account for the PSLRA, which was passed after *Lanza* and *Marbury Mgmt.* As Judge Preska has noted, because of *First Jersey*, a "section 20(a) plaintiff  must *ultimately* establish a defendant's state of mind." *Mishkin*, 1998 WL 651065, at *23. Once saddled with this burden, a section 20(a) plaintiff must also comply with section 78u-4(b)(2) of the PSLRA, which requires securities fraud plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind in "any private action arising under this chapter." *Id.* (quotations omitted)*; see also*

as to Defendant Paulson, (Tr. 66, Feb. 23, 2006) this claim must fail. However, Plaintiff will be given an opportunity to seek leave to amend the Complaint to add, if possible, any allegations that Defendant Paulson was a "culpable participant" in the primary violation.

## III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss as to the Goldman defendants is denied. Defendant Paulson's Motion to Dismiss for section 10(b), Rule 10b-5, and section 20(a) claims is granted without prejudice. Plaintiff is given 30 days from the date of this Opinion and Order to seek leave to amend the Complaint as to Defendant Paulson.

SO ORDERED.

Dated:     September 29, 2006
           New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

_____

*Burstyn*, 2002 WL 31191741 at *8.

40

Service List:

Ira M. Press, Esq.
Kirby McInerney & Squire, LLP
830 Third Ave., 10th Floor
New York, New York
Fax: (212) 751-2540
*Counsel for Plaintiff*

Lionel Z. Glancy, Esq.
Neal A. Dublinsky, Esq.
Mark I. Labaton, Esq.
Robin Howald, Esq.
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Fax: (310) 201-9160
*Counsel for Plaintiff*

David H. Braff, Esq.
Stephanie G. Wheeler, Esq.
Anastasia A. Angelova, Esq.
David E. Swarts, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Fax: (212) 558-3588
*Counsel for Defendants*